UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
DEREK SLOANE,

                            Plaintiff,                      06-CV-5372 (RPP)

        - against -

                                                 **OPINION AND ORDER**
JOSEPH A. KRAUS,

                            Defendant.
------------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**


      On July 17, 2006, Plaintiff Derek Sloane ("Plaintiff"), a prisoner in the custody of the New York State Department of Corrections, filed a complaint against his arresting officer, Police Officer Joseph A. Kraus ("Defendant"), John Does 1-3, the Westchester County Department of Public Safety, and the County of Westchester alleging various incidents of mistreatment in conjunction with Plaintiff's arrest on May 7, 2006.

      On October 29, 2008, Plaintiff filed an amended complaint ("Am. Compl.") alleging excessive force under 42 U.S.C. 1983 and asserting claims under New York state common law for assault, battery, and intentional infliction of emotional distress, naming as Defendants Kraus, the Westchester County Department of Public Safety, the County of Westchester, Detective Frank Tirri, Detective Simone Giuseppe, and Sergeant John Lodge.  Plaintiff, who has previously brought civil actions[1], has failed to serve the last three defendants.

---

[1] See Sloane v. Getz, No. 00 Civ. 4708, 2001 WL 504879 (S.D.N.Y. May 10, 2001); Sloane v. Town of Greenburgh, No. 01 Civ. 11551, 2005 WL 1837441 (S.D.N.Y. July 27, 2005); Sloane v. Mazzuca, No. 04 Civ. 8266, 2006 WL 3096031 (S.D.N.Y. October 31, 2006).

On December 17, 2009, after the discovery cutoff, Defendants moved for summary judgment seeking dismissal of Plaintiff's Amended Complaint.

On May 11, 2010, the Court denied the Defendants' motion for summary judgment as it pertained to Defendant Kraus.  Sloane v. Westchester County Police Department, et al., No. 06 cv. 5372, 2010 WL 1914857 (S.D.N.Y. May 12, 2010).  The Court dismissed Plaintiff's claims against the Westchester County Department of Public Safety and Westchester County.

On July 26 and 27, 2010, the Court held a two-day bench trial on the merits of the Plaintiff's excessive force claim and the common law claims of assault, battery and intentional infliction of emotional distress against Kraus.  Plaintiff seeks compensatory relief in the amount of $250,000 and punitive damages of $500,000. Am. Compl. at 17-18.  Plaintiff, Defendant, William McLane (one of Plaintiff's roommates at the shelter), Detective Tirri, Sergeant Lodge, and Detective Giuseppe all testified at trial.

On August 3, 2010, both parties filed post-trial findings of fact and conclusions of law.  This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

    **I.**       **Testimony Presented by Plaintiff**

        a.  Testimony of Derek Sloane

Plaintiff Derek Sloane is 45 years old, and was raised in foster homes and is a graduate of Ossining High School.  Sloane Tr. 30-31.  Sloane stayed at the Volunteers of America ("VOA") Shelter in Valhalla, New York, in early 2006 following his release from a sentence for criminal possession of stolen property, until he was able to move into

a building where he was working as a watchman and maintenance man.  Sloane Tr. at 32-33.

On May 6, 2006, Sloane moved back into the VOA Shelter after the building where he had been living had to be vacated.  Id.  Sloane drove a pickup truck to the Shelter between 8:30 and 9 p.m.  Sloane Tr. at 34.  Upon his arrival, Sloane was assigned a bed in Room 204 by the Shelter staff.  Sloane Tr. at 36.  Entering the Shelter, Sloane passed through the metal detector and scanned his belongings through the X-Ray machine at the Shelter's entrance.  Sloane Tr. at 37. After unloading his belongings and bringing them up to Room 204, Sloane returned to the vehicle and parked it on the other side of the building.  Sloane Tr. at 39.  When parking the vehicle, Sloane observed a county police car parked in the back of the Shelter.  Sloane Tr. at 39.  Sloane then exited the vehicle and proceeded to the Shelter, going through the metal detector at the entrance once again, and continued directly to Room 204, where he took a shower and went to bed.  Sloane at Tr. 40-41.  He ultimately fell asleep in his bed.  Sloane Tr. at 36, 41.

After falling asleep, the next thing Sloane remembered was that "I was hit in my legs.  All that I remember is hit, me being hit.  And I jumped up from the bed not out of the bed, but sit up in the bed and I stated, what is this, what's going on?"  Sloane Tr. at 41.  He felt "like somebody was hitting [him] with an object."  Id.  He received at least two blows on the bony part of his shin, which was covered by only a "thin white sheet."  Sloane Tr. at 41, 43.  He experienced "pain in both of [his] legs."  Sloane Tr. at 44.  Later that day he observed that his legs were "kind of swollen" as a result of these blows to his shins.  Id.  As he was struck he heard someone twice state, "[G]et the fuck up."  Sloane Tr. at 47.

Upon sitting up, Sloane saw three police officers.  Sloane Tr. at 44.  One of these individuals was carrying "a long black flashlight," which Sloane recognized as the object that most likely had been used to strike him.  Sloane Tr. at 42.  Sloane stated that he did not observe which individual was holding the flashlight at that time.  Sloane Tr. at 45.

The officers then grabbed Sloane under his arm and shoulder and pulled him out of bed.  Sloane Tr. at 46.  In a state of "confusion," Sloane asked "can I get dressed?  Let me get my shoes on."  Id.  An officer responded, "[W]here you're going, you won't need to get dressed."  Sloane Tr. at 47.

Sloane was led out into the hallway, placed face first against the wall and handcuffed.  Sloane Tr. at 48.  Sloane did not see which officer handcuffed him.  Sloane Tr. at 48.  The handcuffs were "pretty much tight and uncomfortable."  Sloane Tr. at 49.  Without reading Sloane his Miranda rights, Kraus asked Sloane questions regarding the truck, including its ownership, each of which Sloane answered.  Sloane Tr. at 49, 50.  One of the officers asked "Where are the keys to the truck?" and Sloane replied "I don't know what you're talking about."  Sloane Tr. at 50.   An officer responded "this guy wants to play games."  Id.  The officers, including Kraus, led Sloane into the communal bathroom down the hall, where Sloane was placed face first against the wall.  Sloane Tr. at 51.  One of the officers again asked about the keys to the truck, and Sloane replied "I don't know what you're talking about."  Sloane Tr. at 52.   Then, "[s]ome type of object was placed in [his] back."  Id.  "It felt like a metal object pressed against my back.  So the only thing running through my mind was, he pulled his gun out."  Id.  Sloane did not identify any officer as having his gun out of its holster.  Sloane Tr. at 51-53.

Upon further questioning, Sloane told the officers the location of the keys, and the officers retrieved the keys from Sloane's room.  Sloane Tr. at 53.  Sloane testified that they then led Sloane out of the shelter in leg irons and handcuffed behind his back, barefoot, and wearing nothing but the sweatpants and sleeveless T-shirt in which he had slept.  Sloane Tr. at 54.  It was dark outside when Sloane exited the Shelter.  Sloane Tr. at 58-59.  Later in his testimony, Sloane instead indicated that "an officer" applied leg irons to Sloane's ankles at the police cruiser outside.  Sloane Tr. at 56.  Sloane testified that the leg irons were "pretty tight.  I would say the same tightness that the handcuffs was on." Sloane Tr. at 57.  Kraus then drove Sloane to police headquarters to be detained until his arraignment later that day.  Sloane Tr. at 58.

Sloane arrived at police headquarters sometime during the night.  Sloane Tr. at 59. Upon arrival, Kraus led Sloane inside, in handcuffs and leg irons, and placed him in a holding cell consisting of a steel "cage."  Sloane Tr. at 59-60.  Sloane remained in the cage in handcuffs and leg irons.  Sloane Tr. at 61.  During his time in the cage, he asked a desk officer to use the bathroom, but was told that they did not have the keys.  Sloane Tr. at 62-63.

In the morning of May 7, 2006, Sloane was taken out of police headquarters in order to travel to his arraignment in Mount Pleasant Court.  Sloane Tr. at 63.  Sloane was transported to the arraignment barefoot, handcuffed and leg irons.  Sloane Tr. at 64. When the police vehicle arrived at Mount Pleasant Court, Kraus ordered Sloane to get out of the vehicle.  Sloane Tr. at 65.  Sloane refused to get out of the vehicle, and informed Kraus that he would not exit the vehicle because he was not wearing shoes, and did not want to risk cutting his feet.  Id.  Kraus then went into the Mount Pleasant Police

Department and returned with two other officers.  Sloane Tr. at 66-67.  One of the officers placed a taser on Sloane's neck and told Sloane that if he did not exit the vehicle, he would be tased.  Id.  Sloane did not testify that he was tased, or identify the officer who made this threat.  Id.  Sloane also did not testify that Kraus was present at the time of this incident.  Id.

Sloane was then escorted to Mount Pleasant Court in Valhalla and after being placed in a room in handcuffs and leg irons, he was arraigned before a judge.  Sloane Tr. at 68.  After arraignment, Sloane was escorted back to the police vehicle, and as he was getting into the vehicle, someone punched the right side of his face, just below the eye.  Id.  Sloane testified that he did not see who struck him.  Id.

Sloane was then transported to the Westchester County Jail at about 6:30 or 7 a.m.  Sloane Tr. at 69.  His handcuffs and leg irons were removed upon arrival at the Westchester County Jail.  Sloane Tr. at 70.  Sloane states that both his hands were red and that his "right foot was very numb" and very red.  Sloane Tr. at 71.  This severity of numbness persisted for a week or two and slowly disappeared within the month of June.  Sloane Tr. at 71-72.  The numbness stopped when Sloane was at Downstate on February 27, 2007.  Sloane Tr. at 72.  Sloane sometimes feels numbness when he "lays down and sleeps on a certain side." Sloane  Tr. at 74.

At the Westchester County Jail, Sloane sent a sick call sheet to the jail medical department.  He saw a nurse, who did not treat him and was told that "they do not deal with nerves," and that the "[b]est thing for me to do was just run warm water on it." Sloane Tr. at 75-76.

b.  <u>Testimony of William McLane</u>

William McLane never reviewed Plaintiff's Complaint or deposition testimony in this action, and has not spoken with Plaintiff since his arrest at the Shelter.  McLane Tr. at 120-121, 123.

On May 6, 2006, McLane was residing at the VOA Shelter in Valhalla, New York, where he had been residing since December 2005.  McLane Tr. at 104.  McLane was assigned to Room 204 the night of May 6, 2006.  <u>Id.</u>  McLane testified that he was awake in Room 204 and speaking on his phone when Kraus "came in the room like he was chasing somebody. . . [s]lamming, slamming the door open."  McLane Tr. at 107.  The next thing Kraus did was to start grabbing Sloane by his legs.  [<u>Id.</u>]

> **Q:**  When you say grabbing, can you be more specific?
> **A:**  Like trying to pull him, like it was hitting him.
> **Q:**  How many times did Officer Kraus hit Mr. Sloane in the legs?
> **A:**  I'd say three to four times.
> **Q:**  What did Officer Kraus use, if anything, to hit Mr. Sloane on the legs?
> **A:**  I couldn't –
> **Ms. Jones:**  Objection your Honor.
> **Court**:  Objection sustained.
> **Q:**  Can you describe the way in which Officer Kraus hit Mr. Sloane in the legs?
> **A:**  He was hitting him like to pulling him out of the bed.

The Court observed the witness lean forward and extend his arms forward in a pulling back and forth manner, and not indicating that any blows were struck by Kraus.  McLane heard Kraus tell Sloane to "[g]et the fuck up."  McLane Tr. at 109.  Kraus then "directed [McLane] to get the fuck out of the room."  McLane Tr. at 110.

As McLane left the room, Kraus was "restraining [Sloane's] legs," while Sloane was "sitting up in, like sideways in his bed."  McLane Tr. at 111-112.  From what McLane described as a "lounge" area about twenty feet down the hall, (McLane Tr. at

7

111-112), McLane next saw Sloane "[b]eing dragged to the elevator on the 2nd floor" by Kraus. McLane Tr. at 113. Later, looking through a window to the area outside the Shelter entrance, McLane saw Sloane being "dragged" from the Shelter entrance "to the police car," where "Kraus told him something, slammed the door, then went back inside the shelter." Id. McLane did not observe Sloane resist Officer Kraus in any way. McLane Tr. at 111.

## II. Testimony Presented by the Defense

### a. Testimony of Officer Joseph Kraus

In May 2007, Officer Joseph Kraus was employed as a police officer by the Westchester County Department of Public Safety. Kraus Tr. at 208. It was part of Kraus's duties and he was authorized to go inside the Volunteers of America Shelter in Valhalla, NY. Kraus Tr. at 209.

On May 6, 2007, at about 9 p.m., Kraus observed a driver operating a dark colored pickup truck. Kraus Tr. at 210. Kraus observed as the driver exited the pickup truck, took something out of the passenger's side of the vehicle, and walked into the VOA Shelter. Kraus Tr. at 211. The truck was parked in a non-secure area where it is illegal to park, but where Shelter employees and employees of other businesses in the vicinity are permitted to park as a courtesy. Id. Kraus then ran the license plate of the truck as well as two other vehicles parked in that area. Id. The NYSPIN system was inoperative at that time and Kraus was unable to ascertain the status of the aforementioned vehicles. Id.

Kraus's shift that day ended at 11 p.m., but upon his return to police headquarters, he was notified that he would be required to work a double shift from 11 p.m. on May 6,

2006, through the morning of May 7, 2006.  Kraus Tr. at 212. Kraus was assigned to patrol the VOA Shelter again on this second tour.  Tr. at 212-213, Def. Ex. "L."

At approximately 2 a.m. on May 7, 2006, Kraus returned to the VOA Shelter and again attempted to ascertain the status of the three vehicles through the NYSPIN system. Kraus Tr. at 213.  At that time NYSPIN was operative and Kraus learned that the license plates of two of the vehicles were valid and the truck operated and parked by Plaintiff had been reported stolen.  Kraus Tr. at 213-214.

After confirming that the truck was still classified as stolen, Kraus contacted his sergeant, Sergeant John Lodge.  Kraus Tr. at 214.  Sgt. Lodge then instructed another officer in the area, Detective Simone Giuseppe, to respond to the location.  Kraus Tr. at 214-15.  Upon the arrival of Sgt. Lodge and Giuseppe, Sgt. Lodge instructed Giuseppe to safeguard the truck.  Kraus Tr. at 215.  Kraus and Sgt. Lodge then proceeded to the building to view the security videotapes.  Id.  Kraus was able to "freeze frame" the video and then interview VOA staff, ultimately ascertained the identity and location in the shelter of the operator of the stolen vehicle as Plaintiff Derek Sloane, assigned to Room 204 at the VOA Shelter.  Kraus Tr. at 216-217.

Kraus and Sgt. Lodge then proceeded to Room 204.  Kraus Tr. at 217.  Kraus knocked on the door, announced himself, apologized to the room's occupants, entered and turned on the lights.  Id. Kraus located Sloane and awakened Plaintiff by nudging Plaintiff in the shoulder area with his hand.  Id.  Sgt. Lodge was a few feet away from Kraus inside Room 204.  Kraus Tr. at 218.  Giuseppe was not in Room 204.  Kraus Tr. at 217.

Kraus then interviewed Sloane about the pickup truck.  During the interview process, Sloane became "defensive…took a step back and raised his hands."  Kraus Tr. at 218.  Kraus then handcuffed Sloane while continuing his interview.  Kraus Tr. at 218-219.  Sloane told Kraus that the truck belonged to his boss.  Kraus Tr. at 249.  Kraus then asked Sloane for the address of his place of employment, and Sloane provided an address that Kraus knew to be false, because the address did not exist.  Kraus Tr. at 250.  After determining Sloane had given false information, Sgt. Lodge held Sloane while Kraus reached over Sloane's bed where his clothing and the keys to the truck were hanging.  Kraus Tr. at 219.  Kraus and Sgt. Lodge then transported Plaintiff to the elevator and down to the first floor.  Id.  They then walked through the lobby, out of the Shelter, and placed Sloane in the back of the patrol vehicle.  Id.

Kraus drove to the location where Giuseppe was securing the truck.  Id.  The key obtained from Plaintiff's pants fit the ignition of the truck, and Plaintiff was then read his Miranda rights.  Kraus Tr. at 220.

Next, Kraus transported Sloane, in his patrol car, to the Department Headquarters in Hawthorne, New York (about a ten minute trip).  Id.  They arrived around 2:30 a.m.  Kraus Tr. at 259.  Upon arrival, Kraus removed Sloane from the car and placed him into a holding cell.  Kraus Tr. at 221.  The holding cell contains a bench, lights and a camera.  Kraus Tr. at 222, see also Def. Ex. N.

Kraus left the building to secure his vehicle, then returned, searched Sloane thoroughly, and removed the handcuffs.  Kraus Tr. at 227. The handcuffs applied to Sloane were Kraus's personal property, and needed for his subsequent tours of duty.  Kraus Tr. at 234.  Sloane was in handcuffs for a total of approximately twenty minutes.

10

Kraus Tr. at 252.  Kraus testified that no leg irons were ever applied to Sloane.  Kraus Tr. at 234-235.

After securing Sloane in a holding cell, Kraus began the booking process which includes filing an incident report, taking fingerprints and photographs, and obtaining the Plaintiff's pedigree.  Kraus Tr. at 227.   During the booking process, Sloane refused to exit the cell to be fingerprinted, assumed a defensive posture and stated "you're going to have to take me down the hard way."  Kraus Tr. at 252-253.

Upon completing this paperwork, Kraus prepared a supporting deposition, which provides evidence in support of a complaint prepared by a detective.  Kraus Tr. at 228. Kraus met with a detective, Detective Tirri, with regard to this case around 8 in the morning of May 7.  Kraus Tr. at 229.  Kraus completed the supporting deposition and signed the felony complaint prepared by Detective Tirri.  Kraus Tr. at 230.  Kraus finished his tour of duty at about 10 a.m., and then left police headquarters.  Id.  From Kraus's arrival at early in the morning on May 7 until his departure at 10 a.m. that day, Kraus never left headquarters.  Id.  Kraus did not transport Sloane to Mount Pleasant Court.  Kraus Tr. at 231.

      b.      <u>Testimony of Detective Tirri</u>

Detective Frank Tirri is employed as a Detective by the Westchester County Department of Public Safety.  Tirri Tr. at 263.  On May 7, 2006, Tirri began working at 8 a.m. and worked until 4 p.m. Id.  Shortly after beginning his shift at 8 a.m., Tirri met with Kraus outside the booking room of police headquarters.  Tirri Tr. at 264.  Kraus told Tirri about Sloane's arrest and provided Tirri with the incident report he had prepared.  Tirri Tr. at 264, Def. Ex. P.  Upon receiving the document, Tirri proceeded to his office to

prepare a felony complaint charging Sloane with possession of stolen property.  Tirr Tr. at 266, Def. Ex. E.  After preparing the felony complaint and a felony report, Tirri called to the booking room and told Kraus that he needed to review the complaint for accuracy. Tirri Tr. at 268.  Kraus and Tirri met to discuss the report at about 9 a.m.  Tirri Tr. at 269.

        c.       Testimony of Simone Giuseppe

Simone Giuseppe is employed as a Detective by the Westchester County Department of Public Safety.  Giuseppe Tr. at 271.  On May 6, 2006, Giuseppe was assigned to a tour beginning at 3 p.m. and lasting until 11 p.m.  Giuseppe Tr. at 272.  At 11 p.m., Giuseppe's tour was extended until 7 a.m. the following day, May 7.  Id. Sometime around 1:30 or 2 a.m. on May 7, 2006, Giuseppe was called by Sgt. Lodge to report to the VOA Shelter in Valahlla.  Giuseppe Tr. at 272-273. Upon arrival, the Sergeant instructed Giuseppe to watch a vehicle that was parked in the parking lot of a laundromat.  Giuseppe Tr. at 273.  Giuseppe secured the vehicle until it was secured at headquarters for safe-keeping.  Giuseppe Tr. at 274.  Giuseppe did not go inside the VOA Shelter that evening, and did not observe any interactions between Sloane and the other responding officers.  Id.

        d.       Testimony of Sergeant John Lodge

Sergeant John Lodge is employed by the Westchester County Department of Public Safety.  On May 7, 2006, Sgt. Lodge was working the overnight shift.  At about 2 a.m. on May 7, Sgt. Lodge met with Kraus at the VOA Shelter.  Lodge Tr. at 279.  At that time, Sgt. Lodge and Kraus confirmed that a truck that was identified as stolen was parked behind the shelter.  Lodge Tr. at 280.  At about 2:30 a.m. on May 7, Sgt. Lodge and Kraus proceeded into the shelter in order to identify who it was that brought the truck

to the facility.  Id.  Sgt. Lodge and Kraus viewed the security videos, and thereby were able to identify the operator of the truck as Plaintiff Sloane.  Lodge Tr. at 282.

After identifying the truck's operator, Sgt. Lodge, Kraus and some staff from the VOA went up to the room where Sloane was residing.  Lodge Tr. at 282.  Kraus knocked on the door and Sgt. Lodge and Kraus entered the room together.  Id.  Sgt. Lodge observed Kraus walk to Sloane's bed, speak to him, and rock his shoulder.  Id.  Upon awakening, Sloane asked Sgt. Lodge and Kraus why they were there.  Id.  Kraus asked Sloane who owned the pickup truck.  Lodge Tr. at 284.  Sloane "stated, his boss.  He was indecisive.  He did not provide a name."  Id.  When asked for his address, Sloane gave "very short answers …he wasn't very specific if it was street or avenue…very very indecisive."  Id.

While Sgt. Lodge and Kraus were in Sloane's room, Sloane assumed a "possibly…combative stance," and at that point Kraus secured him in handcuffs.  Lodge Tr. at 285.  Sgt. Lodge does not recall whether any leg irons were applied to Sloane.  Id.  After handcuffing Sloane, Kraus and Sgt. Lodge brought him out to the hall and downstairs.  Id.  He was then placed in the rear of Officer Kraus's car and transported back to headquarters.  Lodge Tr. at 286.  Kraus transported Sloane to headquarters alone, Sgt. Lodge drove his own car.  Id.

During the booking process at headquarters, Sloane said to Sgt. Lodge from the holding cell, "fuck you, I'm not going to be printed…I'm not going to cooperate with the photographs, I'm going down the hard way."  Lodge Tr. at 287.  This incident occurred about fifteen or twenty minutes after Sloane's arrival at headquarters.  Id.  At this time, Sloane was not handcuffed.  Id.

13

### III.    Findings of Fact

#### a.  Witness Credibility

The Court has considered Plaintiff's contention that during his testimony Kraus concealed that he was currently under suspension for driving while under the influence. Review of Kraus's testimony does not support Plaintiff's contention because the questions asked of Kraus did not call for him to give such an answer.  For instance, when asked by whom he was employed, he confirmed that he was employed by the Westchester County Department of Public Safety.  Kraus Tr. at 207.  His answers were responsive to counsel's questions on direct examination.  Id.  During cross examination, he readily admitted his suspended status.  Kraus Tr. at 235-246.  Sgt. Lodge, Detectives Tirri and Giuseppe were also credible witnesses.

In addition, the Court notes that Plaintiff's accounts of times of events are obviously inaccurate.  Detective Tirri, who prepared the felony complaint for Mount Pleasant Court, did not come on duty until 8 a.m. on May 7, 2006.  Tirri Tr. at 263, Def. Ex. H.  He then had to interview Kraus and prepare the felony report and supporting papers, which kept Kraus, who had completed two tours of duty on May 6 and 7, 2006 at Westchester Police Headquarters until around 10:15 a.m. on May7, 2006.  Def. Ex. L. Yet, the Amended Complaint states that in the early morning of May 7, 2006, Plaintiff arrived at Westchester County Jail.  Am. Compl. at 9.   To the contrary, Plaintiff's Exhibit 1 indicates that Plaintiff was admitted to that institution at 4 p.m. on that date.  Pl. Ex. 1 at p. 2.  In sum, the Court finds the testimony of Kraus and Lodge more credible than that of Plaintiff.

b.  <u>Events at the Volunteers of America Shelter</u>

The Court concludes that Kraus did not hit Plaintiff while he was in his bed, as Plaintiff testified.  Sloane Tr. at 41-47.  The testimony by Defendant Kraus and Sgt. Lodge was that Plaintiff was not hit by any hard object while he was asleep as he testified.  Kraus Tr. at 217-218, Lodge Tr. at 282-285.  Furthermore, Plaintiff's witness McLane, who was in Room 204 and awake when the officers entered the room, did not confirm Plaintiff's claim that he had been hit by a hard object (or flashlight) while he was lying in his bed.  As observed by the Court, McLane indicated that Kraus attempted to pull Plaintiff out of the bed, and McLane, in demonstrating how Kraus "hit" Sloane, made movements with more consistent with shaking Sloane rather than with striking a blow or hitting Sloane with a fist.  McLane Tr. at 107-109.  McLane testified that as he left the room, Kraus was holding Sloane's legs and Sloane was sitting up in bed.  McLane Tr. at 111-112.

The Court also concludes that Sloane's account of being taken to the bathroom down the hall by Kraus, Sgt. Lodge, and Giuseppe and having a hard object or "gun" placed at his back is not credible.  Sloane Tr. at 48-52.  Kraus and Sgt. Lodge did not testify to any trip to the bathroom down the hall, and both testified that, following Sloane's arrest in Room 204, they transported him directly out of the shelter and into Kraus's police vehicle.  Kraus Tr. at 219, Lodge Tr. at 285-286.  McLane, who stated he was interested in what was happening to Plaintiff also does not confirm that Plaintiff was taken to the bathroom across the hall, although he did observe Plaintiff in the hall being taken to the elevator, and later he saw Plaintiff being taken to the police vehicle.  McLane Tr. at 111-113.

c.   Handcuffs and Leg Irons

Plaintiff's testimony that he was placed in leg irons is also rejected, because it is not confirmed by any other witness.  Sloane Tr. at 54, 56.  Kraus denies placing Sloane in leg irons.  Kraus Tr. at 231.  Furthermore, nowhere in McLane's testimony did he indicate that Plaintiff was in leg irons.

Kraus also testified that Plaintiff was only in handcuffs for approximately twenty minutes, and that he removed the handcuffs once Plaintiff was in the holding cell near the booking desk in the Westchester County Police Station at Hawthorne, New York, because they were no longer needed to secure Plaintiff.  Kraus Tr. at 227.  Moreover, Kraus testified that the handcuffs were issued to him personally, and that he would need them for any duties he might be called upon to perform.  Kraus Tr. at 231.  This testimony corroborates his account of having removed the handcuffs as soon as they were no longer necessary. Lodge confirmed that Plaintiff was not in handcuffs in the holding cell or "cage" when he arrived at the Westchester County Police Station, a few minutes after Kraus and Sloane, when he saw and heard Plaintiff say "[y]ou are going to have to take me down the hard way." Lodge Tr. at 287.

Although Sloane testified that his hands and ankles were numb and red, he has not confirmed that testimony with any medical records, nor has he testified that he made any complaint about the tightness of the handcuffs or leg irons to Defendant Kraus, Sgt. Lodge, the desk officer or any other officer at the Westchester County Police Station at Hawthorne, or to the Judge at his arraignment at Mount Pleasant Court, or the officers at that location, nor has he given any explanation for not doing so.  Sloane Tr. 70-74.

Weighing all of the evidence, the Court finds that Plaintiff's testimony that he was left in leg irons and handcuffs from the time of his arrest in Room 204 of the VOA Shelter at around 2 a.m. on May 7, 2007 until he arrived at the Westchester County Correctional Jail to be not credible.  Sloane Tr. at 54, 56, 70.  Although Plaintiff claims that the period of time between his arrest and arrival at the jail extended from 2 a.m. on May 7, 2006 until the early morning hours of 7:30 or 8 a.m., Kraus and Tirri's testimony is that Plaintiff had not even been arraigned by 7:30 or 8 a.m.  Kraus Tr. at 227, 228-230, Tirri Tr. at 269.  Sgt. Lodge and Kraus testified that he was not in handcuffs after 2:30 a.m.  Kraus Tr. at 227, 252, Lodge Tr. at 287.

### d.   The Alleged Threat and Punch at Mont Pleasant Town Court

Plaintiff alleged at trial that upon his arrival at Mount Pleasant Town Court for his arraignment, an officer held a taser to his neck and threatened him with tasing if he refused to exit the police vehicle used to transport him to court.  Sloane Tr. at 66-67. Plaintiff never testified as to whether the officer who held the taser to his neck was Defendant Kraus, and has offered no corroborating evidence to prove that this event took place.  Although Plaintiff testified Kraus accompanied him to Mount Pleasant Court, Officer Kraus's memo book entries (Def. Ex. L) corroborate Kraus's testimony that he did not do so.  Kraus Tr. at 231.

In the Amended Complaint, Plaintiff asserts that after his arraignment in Mount Pleasant Town Court in the early morning hours of May 7, 2006, Kraus punched him in the face and then transported Sloane to Westchester County Jail.  Am. Compl. at 9.  At trial, however, Plaintiff only claimed that "an officer" hit him on the side of his face after arraignment at Mount Pleasant Court, and testified that he did not see who hit him.

17

Sloane Tr. at 68.  Kraus's testimony and memo book notes indicating that he did not take the Plaintiff to be arraigned at Mount Pleasant Court, and in fact concluded his tour of duty at 10 a.m., contradicts Plaintiff's allegations.  Kraus Tr. at 230-231, Def. Ex. L. Plaintiff's inconsistent testimony as to Defendant Kraus's involvement substantially discredits Plaintiff's allegations regarding the alleged punch, as well as his other testimony.

      **IV.**      **Conclusions of Law**

          a.   <u>Excessive Force Under Section 1983</u>

In order to establish a claim under Section 1983, Plaintiff must prove that he suffered a deprivation of his rights under the Constitution or laws of the United States. <u>Katz v. Klehammer</u>, 902 F.2d 204, 206 (2d Cir. 1990).  Here, because Plaintiff alleges excessive force by a police officer prior to his arraignment, a Fourth Amendment excessive force analysis applies.  <u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989).  In this Circuit, the standard for Fourth Amendment excessive force claims under Section 1983 is whether the use of force is "objectively unreasonable in light of the facts and circumstances confronting [the officer], without regard to [his] underlying intent or motivation."  <u>Nimely v. City of New York</u>, 414 F.3d 381, 390 (2d Cir. 2005).  "In recognizing that some degree of force is necessary when effectuating an arrest, the Supreme Court has held that '[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment."  <u>Sash v. U.S.</u>, 674 F.Supp.2d 531, 538 (S.D.N.Y. 2009) (quoting <u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989)).  A *de minimis* use of force is generally not enough to establish a constitutional violation.  <u>Romano v. Howarth</u>, 998 F.2d 101, 105 (2d Cir. 1993).

18

Plaintiffs bringing claims under Section 1983 must also show that the defendants acted "under color of law." 42 U.S.C. § 1983. The Court finds that Kraus and the other Westchester County Police Officers were acting in their official capacity and acted under color of state law.

Each of the Plaintiff's allegations of excessive force is considered in turn.

       i.   <u>Plaintiff's Arrest</u>

Defendant Kraus had reasonable grounds to arrest Plaintiff. He had observed Plaintiff operating a truck that Kraus later found to have been reported stolen. Kraus Tr. at 210-211, 213. He identified Plaintiff as an occupant of Room 204 by viewing surveillance videos at the VOA Shelter and through conversations with VOA personnel. Kraus Tr. at 215-217. Upon entering Room 204, Kraus recognized Plaintiff as the driver of the stolen vehicle, and therefore had probable cause to arrest Plaintiff for knowing possession of stolen property. Kraus Tr. at 217, <u>see</u> <u>Manganiello v. City of New York</u>, 612 F.3d 149, 161 (2d Cir. 2010).

With respect to Plaintiff's claim of excessive force in making the arrest, Sloane has not shown by a preponderance of the evidence that Defendant Kraus hit him with a flashlight or other hard object. Moreover, the physical force used to awaken Plaintiff, as described in the testimony of Defendant Kraus, Sgt. Lodge and McLane (Kraus Tr. at 217, Lodge Tr. at 282, McLane Tr. at 107-109), was objectively reasonable in light of the totality of circumstances, and therefore does not rise to the level of a constitutional violation. <u>Nimely</u>, 414 F.3d at 390.

ii.      The Alleged Bathroom Assault

Plaintiff also alleges that Kraus used excessive force in removing Sloane from Room 204 and taking him to a bathroom down the hall, where he was shoved against the wall and a hard object, which the Amended Complaint states was a gun, was pressed against his back.  Am. Compl. at 5.  At trial, Plaintiff testified that the hard object could have been a "stick or gun."  Sloane Tr. at 52.  As discussed above, Plaintiff has presented no corroborating evidence to indicate that he was in fact taken to the bathroom and pressed against the wall, and Defendant Kraus's testimony, which is consistent with that of Sgt. Lodge, indicates that Plaintiff was taken from Room 204 and brought directly to the police vehicle.  Kraus Tr. at 219, Lodge Tr. at 285-286.  Plaintiff does not claim any physical injury as a result of this incident.  In light of the credible testimony of Defendant Kraus and Sgt. Lodge and lack of any credible contradicting evidence, Plaintiff's allegations regarding the bathroom assault fail to state a claim for excessive force.

iii.      Handcuffs and Leg Irons

Plaintiff claims that Defendant Kraus used excessive force in applying handcuffs and leg irons too tightly in conjunction with the arrest.  Plaintiff, however, has not shown by a preponderance of the evidence that Defendant, in applying the handcuffs, intentionally or recklessly applied the handcuffs too tightly.  At no time, according to Plaintiff, did he state to Kraus or to anyone else that the handcuffs were applied too tightly.  "Frequently, a reasonable arrest involves handcuffing the suspect, and to be effective handcuffs must be tight enough to prevent the arrestee's hands from slipping out."  Grant v. City of New York, 500 F.Supp.2d 211, 217 (S.D.N.Y. 2007) (quoting Esmont v. City of New York, 371 F.Supp.2d 202, 214 (E.D.N.Y. 2005).  Additionally,

the consistent testimony of Kraus and Sgt. Lodge regarding Plaintiff's assuming a defensive posture demonstrates that the application of handcuffs to restrain Plaintiff was objectively reasonable under the totality of circumstances.  Kraus Tr. at 218, Lodge Tr. at 285.

Furthermore, Plaintiff has not shown by a preponderance of the evidence that Kraus left the handcuffs on him for an unreasonable length of time.  Kraus and Lodge both testified that the handcuffs were removed after about twenty minutes.  Kraus Tr. at 227, Lodge Tr. at 287.  Plaintiff has made no showing that leaving handcuffs on for twenty minutes to incapacitate him for booking is objectively unreasonable.

       iv.     The Alleged Threat and Punch at Mount Pleasant Town Court

In light of the absence of evidence supporting Plaintiff's contentions that he was threatened with a taser and punched outside Mount Pleasant Town Court, as well as the lack of testimony that Defendant Kraus was involved in the alleged threat or punch, or present when these incidents took place, Plaintiff's claim that these events constituted excessive force applied by Defendant Kraus fails.

     b.  State Law Claims

In addition to the claims for excessive force under Section 1983, Plaintiff brings claims under New York state law for assault, battery, and intentional infliction of emotional distress.

With the exception of Section 1983's requirement that the conduct alleged occurred under color of state law, the essential elements of excessive force claims and assault and battery claims are substantially identical.  Posr v. Doherty, 944 F.2d 91, 94-95 (2d Cir. 1991).  Plaintiff failed to show, by a preponderance of the evidence, that

Defendant Kraus used excessive force at any point during his arrest and detention, and Plaintiff's common law assault and battery claims fail for the same reason.

Plaintiff has also failed to prove, by a preponderance of the credible evidence, that Defendant Kraus intentionally or recklessly inflicted emotional distress on Plaintiff. Under New York law, a claim for intentional or reckless infliction of emotional distress requires (1) extreme and outrageous conduct; (2) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and injury and (4) severe emotional distress.  Holwell v. New York Post Co., 81 N.Y.2d 115, 121 (1993).  Plaintiff has failed to demonstrate by a preponderance of the credible evidence that Defendant Kraus's conduct was extreme or outrageous.  Plaintiffs most extreme allegations, including that an officer held a gun to his back in the Shelter bathroom and punched him in the face following his arraignment, fail to support a claim for intentional infliction of emotional distress against Kraus, because Plaintiff has failed to show by a preponderance of the evidence that the first incident ever actually took place, or to prove that Defendant Kraus was involved in any way in the second incident.   Moreover, nowhere in the record does Plaintiff show that he has suffered severe emotional distress as a result of these alleged incidents

### V.    Conclusion

For the foregoing reasons, Plaintiff has failed to establish Defendant Kraus's liability for the use of excessive force under Section 1983, or for the state law torts of assault, battery, or intentional or reckless infliction of emotional distress.

Judgment shall be entered for Defendant Kraus on all claims.

IT IS SO ORDERED.

Dated: New York, New York

September _3_ , 2010

Robert P. Patterson, Jr.
U.S.D.J.

**Copies of this Order have been sent to:**

**Counsel for Plaintiff:**

Eric Benjamin Epstein
Dorsey & Whitney LLP
250 Park Avenue
New York, NY 10177
(212)-415-9309
Fax: (212)-953-7201
Email: epstein.eric@dorsey.com

**Counsel for Defendant:**

Fay Angela Jones
Westchester County Attorney's Office
148 Martine Avenue, Room 600
White Plains, NY 10601
(914)-995-2672
Fax: (914)-995-3132
Email: faj2@westchestergov.com

23